Please call the next case. Our next case is 414-0614-WC. Sandra Thompson v. Mixtecution Motors of North America. Christopher Mose for the appellate, Will Vist for the medic, and the athlete. Good morning, Justices. I'm Christopher Mose. I represent Sandra Thompson. May it please the Court. In workers' compensation cases, we talk about causal connection a lot in a medical context, but actually we have two different kinds of causal connection that we have to deal with. And one is in the arising out of issue where we have to determine whether there is a causal connection between the job and the injury. And also the obvious causal connection of whether what the person is dealing with now is related to the injury they had. I'd like to begin by discussing the arising out of issue. As this Court has addressed this issue a number of times in the last few years, obviously we know that we look at three different kinds of risks when determining whether there is an injury that arises out of it. And the first is whether the risk is peculiar to the employment, whether the person is doing something that's specific to the job the employer can reasonably expect them to be doing when they have their injury. The second kind of risk is what's called the neutral risk, where they're doing something which the general public may also engage in. So is this a neutral risk you're acknowledging? Is this a neutral risk? Well, I wrote my brief before the ADCOC decision came back. And now in light of ADCOC and your analysis of ADCOC, what do you say? Yes. Well, in light of ADCOC, in ADCOC they talked about walking as a neutral risk. And the, of course, neutral risk can be heightened if you're qualitatively or quantitatively more at risk than the general public. That's all true, but we probably would have to confine our analysis to the premise as testified by the claimant, that her injury occurred while she was walking and stepped funnily. Would you not say that? She did not testify to that. She did not? She did not. The arbitrator... Where does that come from? That comes from the arbitration decision, which was confirmed by the commission. And he took that from the first visit to the first operation. Medical records? Yes. Well, there are any number of medical records that bear that same history. And then you were going to get to what her testimony was, which was that she was walking extremely fast and pivoted. But that history, that version, isn't contained in the medical records, is it? It's not contained in the medical records. And I would submit that that's not where we end our analysis, just by what history is in the medical records. And this Court has gone through this in the Young decision, cited in my brief, in the Tolbert decision. And in Young, the Justice has pointed out that what's in the medical records is a general statement, because a patient isn't necessarily giving the doctor the full panoply of what happened. And when they're testifying at trial, that's an elaboration on the general statement. That's when the commission chooses to believe the petitioner. I'm sorry, I missed the first part of what you said. That's when the commission chooses to believe the petitioner. In this case, they didn't. I would submit, in this case, that the arbitrator made a very bad decision. We're concerned about the commission, not the arbitrator. Okay, well, the commission's affirming that. They adopted it, so it's their decision. Correct. And in this case, didn't believe it. They didn't believe that she pivoted. I think they believed that the first time they ever heard that was when she testified before the arbitrator, and all these years in her medical records, it's just that I stepped funny. And the point I'm trying to make is that I don't think it's justifiable to disbelieve the petitioner's testimony of walking fast throughout basically half her work day, four hours, where she has to, and she, you know, described her workstation very well. She's going back and forth between five stations, trying to keep up with this. Counsel, I don't think anyone's suggesting that it would have been wrong if the commission had believed her. This is manifest way. It can go either way. Now, the question becomes, is there sufficient evidence in the record to suggest that the commission's decision, the opposite decision, is clearly apparent? Now, credibility is theirs, not ours. And if they had chosen to believe her and said, no, no, she testified, she pivoted, and we're going to find that that arose out of the course of her employment because it's a quantitative difference than just regular walking, we couldn't have reversed it. But they didn't believe her. And they said, wait a minute, the only thing you said was you stepped funny, and that's not a quantitative difference, a qualitative difference, pardon me, not quantitative, from just normal walking. Where I'm going with all this, Justice, is that stepping funny can be an accident in light of someone who has an increased risk of walking when they're doing it qualitatively more risky in the sense that they're doing it at a rapid pace to keep up with an assembly line. And quantitatively, you would have to hang your hat on them because they're doing it more often in the general public. I would say both, Justice. Because in Villa Park, going up and down the stairs was a quantitative risk. And in Adcock, there was quantitative risk because he did it so often. But also in Adcock, they talked about qualitative risk, with the speed at which he had to rotate this chair back and forth to weld the locks. So I think you have both qualitative and quantitative risks here. The fact that it's the act of walking, does that somehow take it out of the realm of Adcock and Young and so forth? Because really you're talking about the act of walking, and there you have a fairly strong line of case authorities saying that the act of walking does not place the individual at a risk greater than the general public. The act of walking doesn't increase the risk, just as reaching doesn't increase the risk, or going up and down the stairs, or bending. It's when you do it in a manner that increases the risk, such as in Komatsu where the guy is bending in a fashion.  Is there any case out there that would lend support that the act of walking itself, not climbing stairs, but the act of walking itself can create a compensable accident, either from a quantitative standpoint or a qualitative standpoint, when you look at the neutral risk analysis? Well, apart from what you said in Adcock about walking, I would suggest that it's unfair to separate walking out as the one activity which gets shuffled to the back of the line. I don't know why walking is intellectually any different from reaching. You said the case where the gentleman was reaching into the barrel a number of times? Yeah, the box, the Young case, right. He wasn't just reaching, though, was he? No, he wasn't just reaching. He had to reach in. He overstretched. It was an increased risk by just the peculiar nature of the employment, which is what I think we have here. I just don't think it's fair to say, oh, she's walking. That's not compensable, when the record overwhelmingly supports the conclusion that she's walking back and forth four hours a day very quickly, and yet she pivots four times per minute as she's going back and forth. Well, the problem is the commission didn't make that finding, though, right? They didn't make the finding, and I think that you're going to have to say that it's against the manifest way of the evidence to say that she's not believable and her job just isn't. Right. I mean, the reason they didn't make that finding was based on credibility. Right, and the credibility was not based – I'm sorry, the credibility finding was not based upon her testimony about the job. Her credibility finding was based upon the notion that the medical records don't say she pivoted. Well, you know, if we just look at her testimony about her job, first of all, it's intuitively it makes sense, because that's what someone does when their job is to bring parts, assemble parts and bring them to the assembly line. Second of all, it's contained in the history she gave Dr. Koh. Thirdly, it wasn't rebutted by the employer, which had the opportunity to bring someone in to say that's not how you do it. I think that there's just – it's beyond any reasonable doubt that that's how one does that job. And she's doing this job. She – if you don't want to believe she pivoted, you can certainly accept the commission decision that she stepped funny. And stepping funny is an accident when you have a qualitatively increased risk and a quantitatively increased risk to walk. What does that mean, by the way, stepping funny? Right. What does overstretching mean? What is – you know, I lifted this box and I did it kind of funny. We don't really get into the weird little things that make an accident happen instead of just what you normally do. That's not found in our cases. I think we sort of understand that if you do this, it's an aspect of your job, or you're doing it a lot. You know, if we accept the theory that anything that happens to an employee during the workday is compensable, we'd be adopting positional risk. Right. Unfortunately, our Supreme Court has said that's not the law of Illinois. It has to arise out of and in the course of. And in this particular case, the commission decided the only thing this woman did was walk, and she stepped funny. And my question to you is the same question I asked before. Why is the opposite conclusion clearly apparent? And the only thing you can tell me is because she said otherwise. And they didn't believe her. I think that not believing her, and forgive me if I'm repeating what I said, is against the manifest way of the evidence. And this Court has shown a willingness to look into – go beyond what's just in the medical records for a job description or a mechanism of injury, which is what you guys did, the justices did in Tolbert and in Young. Did we reverse the commission in those cases? Yes, you did. Did we affirm? You reversed the commission in both instances. And was there support other than the statement of the petitioner in those cases that supported it? In Tolbert, which was a gentleman who was working in a grain bin and said he was exposed to bird feces, and histoplasmosis. There was no question there was bird feces in that grain bin. Because the employer didn't dispute that. They had someone at trial. They didn't get up and say, well, there's no bird feces in there. It was presumed that he was testifying in a credible manner. And you reversed the commission's decision. In Young, you reversed the commission as well. The initial accident report simply said that he reached into a box and he felt a snap. But the medical histories and the medical records really confirmed his testimony. There were only minor discrepancies. And as a matter of fact, the employer's accident report in Young said he overreached and so forth. They'd have to look into? My reading of Young was the initial accident report did not say that there was overreaching. And in the history of medical, I believe the employer in Young complained that the histories got more and more dramatic to the doctors as time went on. And the allegation was that he was embellishing his history. And the commission found that he had not engaged in a compensable accident. And you reversed that, noting that statements to medical providers or general statements when you testify at trial that someone testifies at trial, that's an elaboration on a general statement. Because when you testify, you're telling the whole story. You don't have that opportunity when you're in the doctor's office. You've acknowledged, obviously, that the act of walking is a neutral risk. So with regard to this case, what are you suggesting in light of your position or holding should be that walking more frequently and pivoting, what are you asking us to hold here that would reverse the commission? Sure. I'm asking you to, number one, find that walking is a neutral risk, which was suggested in ADCOC. Which we know it is, yes. Right. And that is, you know, reversing the commission because the commission decision said, well, there's no increased risk. The commission didn't really do a thorough risk analysis as you have done in ADCOC and Young and all the other cases. Yes. So I think you should reverse their conclusion that walking cannot be an increased risk, but rather a neutral risk, which you have to go through the analysis. In order to do that, we'd almost have to find that she pivoted. Yeah. We'd almost have to find that it happened when she pivoted, as opposed to merely stepping down wrongly or stepping funny. Stepping funny. I think, yes, I think you can find stepping funny is an accident. No question it's an accident, but is it an accident that arose out of her employment or did it just merely arise out of the act of walking? I guess what I mean to say is if you're walking quickly to keep up with an assembly line, you're increasing your chance to step funny. When you're walking for half your day, you're taking a lot of steps, and that increases quantitatively your chance for stepping funny. Do you have any empirical baseline of what normal number of steps to take? I mean, there are a lot of fitness people who have these pedometers and say you're supposed to have, what, 10,000 steps a day to remain somewhat fit. Why do we not see any evidence anymore of what's normal and what's out there? I suppose. An expert for everything. In the context of our workers' compensation cases, we typically try to focus on this individual. Perhaps that's why we... How many steps is too much? You can see the difficulty of trying to come up with some bright-line ruling on that. How could you ever have a bright-line ruling? But you're right. Right. But we can talk about, and this Court has, what is more than the general public. I also want to point out... Your time is up. Thank you. Counsel, you may respond. Good morning, Justices. Elizabeth Capaletti on behalf of the employers. We assume you're pleased and happy to be in Springfield. I am very pleased and happy to be in Springfield. I came yesterday because it's too hard to get up at 4 in the morning. I get too stressed out that I'm going to be late. I was a little afraid to mention Adcock because I didn't want to start dissension again about how we do this analysis. But that was the analysis I actually employed in my brief, was the neutral risk analysis, because that's what we have to do here. And that's really the question. Counsel has spoken at length about her job duties. She had to walk quickly and she had to turn numerous times a day. I just don't think that that's really the point here. I mean, this is not a repetitive trauma claim. This isn't, you know, I walked 500 times that day and then on that last time it gave out. This is a specific claim that she testified that she was walking quickly and pivoting. And as Justice Hoffman noted, the Commission just simply didn't believe her. I mean, they just said you're not credible. They did not believe that testimony. The testimony that they believed was that she was merely walking and either walking heard a pop or stepped funny and heard a pop. So that's really the analysis. That's what the accident was. She was walking across the floor and she heard a pop in her Achilles tendon when it ruptured. What is it they didn't believe her about? They didn't believe the very detailed description about I was all of a sudden walking quickly, pivoting, carrying this part. Because they went back and they analyzed all of the medical records contemporaneously when she was actively receiving treatment. And those records indicated that immediately after she had sustained this injury, she went to physical therapy. That's why they didn't believe her. But is the state of the law assuming they believe her it is compensable? For this case, no. I don't believe that either because we haven't looked at the second component, which is her condition had degenerated to such an extent that she basically was an Achilles tendon rupture waiting to happen. And that's what Dr. Holmes testified to. Yeah, but if they had believed that she pivoted and pivoting was required in her employment, then in that particular case it would be a cause. And there could easily be a finding that it may not have been the only cause and it may not have been the major cause, but it was a cause of the pivoting and therefore compensable. So I think it does rise or fall on whether they believe she was pivoting or merely walking. And I think that's what this case is all about. I agree. Because it's simple. That's the first one. I guess I was going to the second, which was CISPRO and the everyday activity exception. So you would say pivoting is an everyday activity. Absolutely. I mean, I pivot all the time. That would be your response to that argument, wouldn't it? Pardon me? Absolutely. It is, but that wouldn't end the inquiry because we're talking about, again, his theory would be that if you – let's say the record shows a person walks and pivots 1,000 times a day in the job. Isn't that clearly we'd have to concede beyond what the normal person does? So why couldn't you recover on that theory? That qualitative amount because – Quantitative. Quantitative. Sorry, quantitative amount because I think that that's the whole point of CISPRO is even with that risk analysis, you still have to make the analysis, but for her condition had degenerated to such an extent that any movement that you would have done, whether it be the first time or the hundredth time, was going to ultimately – it was her underlying condition that was the cause of her condition. But in this case, there would be because, as you alluded to and you acknowledged, there was, even if you had a preexisting condition, it's compensable under the – it only has to be a cause, not a sole cause analysis, right? Her doctor testified that it was a cause, right? Correct. Her doctor. So they were competing. I mean, I think all Justice Hoffman is saying, and Justice Hudson, is it's a manifest weight case. Correct. If they would have said we find – we believe her, she was pivoting, we find that was a quantitative difference than normal walking, and we believe her expert who says it was a cause, we'd be saying that's not – an opposite conclusion is not clearly apparent. Correct. And I think that's what you did in Accolade, which is exactly – you pointed out that we do think that there are some differences in the histories here, but that's not our job. That's the Commission's job, to weigh the evidence, to – Weigh the credibility. Find credibility and make a determination as to who they believe. I guess what I was responding to was also the medical evidence that Dr. Holmes gave a contrary opinion, as you're saying, to Dr. O'Connor, who basically said it just happened to happen while she was at work. Would it matter where she was pivoting or walking, even, as you're saying, qualitatively, she was going to have an Achilles tendon rupture no matter what? And I think that that was the analysis that the Supreme Court was talking about. CISPRO is that if you've gone to such a point, which is also the University of Illinois case, where they were twisting in the chair and the disc ruptured, that if you're at such a point that no matter – even if you're pivoting or whatnot, that it's going to happen, that that's not work-related. The link still isn't there for the risk analysis because your degenerative condition, it's basically a personal risk. I mean, her Achilles tendon ruptured as she was walking, and it was because – I mean, she was at the doctor five days before under active treatment for her heel and her foot and her ankle with surgery being recommended for a bone spur that Dr. Holmes explained was actually a finding that the Achilles tendon had been weakened. So, I mean, Dr. Holmes' opinion was that Achilles tendon was going to rupture no matter what she did. It really had no bearing on her work-related activities. It had generated such a point. So that's the evidence to support the decision. That's part of it, yes. But there was a contrary medical opinion. Correct. Correct. Ms. Cappelletti, I want to go back to the legal analysis and the walking part of this. Let's assume the commission had found, for the claimant, found that the accident did arise out of her employment and based it on the history that she was walking along the lines of what counsel had indicated, a large number of trips and many steps taken during the course of the day, and they said that from a quantitative standpoint, we find that this is a – even though it was just the act of walking, we find that it's compensable. Is that legally – would that decision be legally sustainable? I believe there is a long line of cases, and specifically First Cash, I think, where it even specifically states the act of merely walking is not in itself an increased risk. Is there a case that specifically speaks to evidence that says we've walked 15,000 steps where the normal person is 10,000 steps? Yes. I have not seen that case. And you don't want to tie yourself into that. No, I don't. Because you could be back next year, and we could be quoting Cappelletti saying she's acknowledged it. I was actually doing a WICLA presentation on ADCOC, and the petitioner's attorneys were asking me, well, how do we prove this now, this quantitative analysis? How is it we go about saying what's quantitative or what's qualitative? Well, you were counseled to ask, why should walking be treated differently? That's why I asked. I mean, there are cases that take common, everyday body movements and find them to be compensable accidents from either a quantitative standpoint or a qualitative standpoint. So why should walking be treated differently? Well, I think that everyone walks every day, and everyone chooses different amounts, whether or not you think that running is healthy for you or not. I mean, there's walking that you do all the time. So that is a different analysis. I also think the Supreme Court has been clear that walking in and of itself is not an increased risk. What words did they use? I mean, the Supreme Court has told us over and over again. What words did they use? Pardon me? You said merely? That was in first cast, yes. Yeah, well, merely implies quantitative. I mean, it's the minimus. If you look at the definition. I understand. So we've always had a quantitative, no matter what language you want to use. But I guess not. It's how much? Is that what you're asking me? I don't know if I want to say that. Merely would suggest that. It's a wholly subjective decision, isn't it? It is, which all comes back to what the Commission decides, right, and how they view the evidence. And I do think, I mean, to Counsel's point, he was asking about stepping funny. I think I did address that in the brief. There are times when you're walking and there's a defect on the floor. We see the carpet and we walk on the carpet and you're stepping funny because of the carpet. Or I'm trying to think. I think there's a lot of this. Just being on a concrete floor is not enough. But if there's some sort of defect, that's what we're looking for. Same with stairs. The act of walking up and down the stairs is not necessarily in itself an increased risk. But when you look at those stairs and there's a runner that's poking up or they're incredibly dangerous because of the alignment and there's no side rolls. I mean, that's more what we're looking at relative to the, I guess, qualitative. Is there a defect when we're doing those acts that we look at that are inherently everyday activities? And the Supreme Court, I think, has told us that there has to be something more there than just walking up and down stairs or walking across a concrete floor. I don't think anyone has ever said that walking doesn't present a risk. I think what these cases are saying is the act of merely walking does not present a risk greater than that which the general public is exposed to at all times and, therefore, it's not compensable. It has to be qualitatively different. The act of walking has to be qualitatively different or quantitatively different. You've got to walk more than the general public or there's something about where you're required to walk that increases your risk. But no one disputes the fact that walking presents a risk. It's just a question of is it in and of itself a compensable risk. Right. I think we're saying the same thing, that walking is a neutral risk. And so, therefore, we have to look at what is it that creates that increased risk. In any event, you're arguing that the Commission didn't answer all of this. Right. In this case, the Commission found that she was just merely walking and nothing about her job increased that risk. And they made a specific finding that she wasn't credible relative to her testimony about the pivoting. And I would submit that that should be affirmed. Thank you. We should probably get rid of that word merely in argument in the court and talk about quantitatively or qualitatively. Sure. I guess I have to stay with the case law. That's what it says. Well, that's not what it says in the first catch. The first catch merely says by itself the act of walking across the floor does not establish a risk greater than that faced by the general public. You would know best, right? So I'm certainly not going to argue with you. I agree. I think that these are difficult cases. I mean, obviously, you've heard a lot of them recently in their talk. Thank you. Thank you, Counsel. Counsel, you may reply. Thank you. I did want to take a couple of minutes to discuss the CISPRO decision. When counsel discussed that Dr. Holmes said that her Achilles was going to rupture anyway. It just happened to happen at work. That's what CISPRO is for. CISPRO tells us that if your body structure gives way under the stress of your labor, that that is a compensable injury and there is causal connection. You can't take away from it just because, well, it's going to happen someday. Well, but we got to let's talk about what do you mean the stress of your labor? Right, and that goes back to the risk, which we discussed. As I read the three categories of risk, peculiar risk, neutral risk, and personal risk, I view them as A, B, and C. Is there a peculiar risk? No. Is there a neutral risk? No. Is there a personal risk? No. And I think the court said this in ADCOC as well. I don't think you can have two at the same time. I think that if you have a peculiar risk or a neutral risk, which is qualitative or qualitatively increased, you don't have to look at the, well, is this personal? Is this going to happen anyway because they had a disease structure? Because the Workers' Compensation Act is designed to allow people to recover if they have a condition, assuming there was an accident to begin with. So that's why I find Dr. Holmes' testimony strangely self-serving but also irrelevant because the fact that she had a diseased Achilles tendon, which was not at the point he thought, where it ruptured was not at the bottom where he thought she had a whole other treatment. That's a red herring. But he acknowledged that, you know, that was a red herring. It may have been diseased, but it nevertheless ruptured by her employment. Thank you. Thank you, counsel. Both of your arguments in this matter will be taken under advisement. This position is now issued.